UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| KEITH SAXTON, | Civil Action No.: 3:15-cv-1244-JFA-TER |
| Plaintiff, | |
| -vs- | |
| | **REPORT AND RECOMMENDATION** |
| TOWN OF IRMO POLICE DEP'T, BRIAN BUCK, and MARK SHIRLEY, in their individual capacities, | |
| Defendant. | |

**I.     INTRODUCTION**

This action arises out of Plaintiff's termination from the Town of Irmo Police Department. Plaintiff alleges race discrimination by the Town of Irmo Police Department (Irmo PD) in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. Plaintiff also alleges state law causes of action against Irmo PD for defamation and invasion of privacy. He asserts state law causes of action against Defendant Mark Shirley for defamation and civil conspiracy.[1] Against Defendant Brian Buck, he asserts a state law cause of action for civil conspiracy. Presently before the court is Defendant Mark Shirley's Motion for Summary Judgment (Document # 50) and Defendants Town of Irmo Police Department and Brian Buck's Motion for Summary Judgment (Document # 54) (Irmo PD Motion). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. This report and recommendation is entered for review by the district judge.

---

[1] Plaintiff also asserted a cause of action for tortious interference with contractual relations, which has been dismissed. See Order (Document # 56).

## II.     FACTS

Keith Saxton began working for the Town of Irmo Police Department (Police Department) as a Patrol Officer in August 2012. Pl. Dep. 10 (Ex. 1 to Pl. Resp. (Document # 66-1)). In the fall of 2012, shortly after beginning his employment with Defendant Irmo, Plaintiff developed a friendship with Susan Shirley, the wife of Defendant Mark Shirley (Shirley). Pl. Dep. 13. At some point, Plaintiff and Susan Shirley engaged in a sexual relationship that lasted for a few months. Pl. Dep. 13; Susan Shirley Statement (Ex. 6 to Irmo PD Motion). At this time of this sexual relationship, Susan Shirley misled Plaintiff as to her marital status, and Plaintiff believed her to be separated. Susan Shirley Statement, p. 3; Pl. Dep. 90-91.

Defendant Mark Shirley represents that in April of 2013, he received an unsigned letter claiming that a black rookie cop was having an affair with Shirley's wife, Susan Shirley. Anonymous Letter (Ex. A to Shirley Motion); Shirley Dep. 14 (Ex. 6 to Pl. Resp. (Document # 66-6)). On May 23, 2013, Shirley and another individual went to the home of Plaintiff and found Shirley's wife at the residence. Pl. Dep. 107-09. The same day, Shirley called Defendant Brian Buck, the Town of Irmo Chief of Police, to complain that Plaintiff was having a sexual affair with his wife, and that Plaintiff conducted the affair, at least on occasion, while on duty and at Shirley's house. Complaint Form (Ex. 3 to Irmo PD Motion). Chief Buck advised Shirley that "if he wanted to file a complaint, we would be happy to assist him with that. He would have to complete a sworn statement form making his allegations and then we would conduct an internal investigation subsequent to his completing the sworn statement." Buck Dep. 16. On that same date, Chief Buck sent correspondence to Shirley's divorce attorney, Anthony Charles, Esquire, including the citizen complaint information. Attorney letter (Ex. 4 to Pl. Resp. (Document # 66-4); Buck Dep. 18-19. This

letter renewed the need for the completed statement forms and "Citizen Complaint Receipt" to begin the investigation. Attorney Letter.

Chief Buck called Plaintiff the same day to inform him of the allegations and that an Internal Affairs investigation would be conducted. The parties dispute whether Chief Buck also told Plaintiff at that time that he was not to have contact with Susan Shirley while the investigation was pending. Chief Buck asserts that he did. Buck Dep. p. 74 (Ex. 2 to Irmo PD Motion); Internal Affair Investigation Log (Ex. 4 to Irmo PD Motion). In his deposition, Plaintiff denied that the Chief directly ordered him not to have contact with Susan Shirley. Pl. Dep. 30. In his sworn testimony in his unemployment hearing, however, he admitted Chief Buck told him not to handle calls regarding Susan or Shirley. ESC Testimony p. 23 (Ex. 17 to Irmo PD Motion). Plaintiff admits that it would be improper to contact a witness to an IA investigation. Pl. Dep. 32. He also agreed it would be wrong to discuss the facts underlying the alleged misconduct with a witness. Pl. Dep. 32. Finally, Plaintiff agreed that, during the investigation, he was given two "Garrity" warnings. Pl. Dep. 31. The Town of Irmo Garrity warnings specifically advise officers not to discuss the case with witnesses. Garrity Warning to Plaintiff (Ex. 9 to Irmo PD Motion); Pl. Dep. 31. He also acknowledged that Captain Nates suggested he cut off all contact with Shirley. Pl. Dep. 36.

Chief Buck also prepared an Irmo Police Department Complaint Summary providing a brief narrative of the potential complaint. Complaint Form; Buck Dep. 23. Shirley was not involved in the preparation of the Complaint Summary. Id. Plaintiff received a copy of the Complaint Summary on June 3, 2013. Complaint Form.

On approximately May 29, 2013, Chief Buck turned the investigation over to Capt. Joe Nates, even though he had not yet received a sworn statement from Shirley. Internal Affair

Investigation Log p. 1; Nates Dep. 17-19 (Ex. 7 to Pl. Resp. (Document # 66-7)). Capt. Nates interviewed several potential witnesses prior to speaking with Plaintiff on June 3, 2013. Nates Dep. 34. Shirley had related to Chief Buck that Irmo Detective Donnie Hare had called him, at Susan Shirley's request, to try to allay Shirley's suspicions. Shirley Dep. 15 (Ex. 12 to Irmo PD Motion). Nates interviewed Hare and learned that he and Susan Shirley were friends and Hare had indeed called Shirley at her request. Nates learned during the interview that Susan Shirley had sent Hare text messages immediately before and after Shirley called Chief Buck to lodge his complaint. Internal Affairs Memorandum (Ex. 12 to Pl. Resp. (Document # 70-12)). In part, those messages stated:

> Susan: Shit has hit the fan
> . . .
> Susan: Mark [Shirley] called Chief!!!
> . . .
> Hare: Well, I'm so sorry. So Keith [Plaintiff] didn't say what the Chief said?
> . . .
> Susan: Just that Mark called and he was pissed. Chief told him that he needed to calm down and instead of doing over phone that he would mail the forms Keith . . . is upset because Mark did not talk to Chief till later but gave Betty[2] an earful.
> . . .
> Susan: Just letting you know I am ok. Have u heard anything? Keith is worried.
> . . .
> Susan: Keith just talked to the chief!!! I am so pissed!!! Keith turned around one time in my neighborhood.
> . . .
> Susan: Keith thinks he is screwed! Mark said he conducted a sexual relationship with his wife and came to his marital residence. He is being accused of patrolling out of limits and behavior not becoming of an officer. Mark can't prove any of it.

Text Messages Between Susan Shirley and Hare (Ex. 5 to Irmo PD Motion).

Plaintiff testified in his deposition that he asked Susan Shirley not to talk to the Chief. Pl. Dep. 45. He also admitted it was possible that he discussed the investigation with her and his

---

[2]Defendants note that Betty is a receptionist for the Town of Irmo. Irmo PD Motion p. 3, n. 2.

concerns about the investigation. Pl. Dep. 42-43. Despite Plaintiff's efforts to dissuade her, Susan Shirley asked to speak to Chief Buck and ended up giving a statement to Capt. Nates. In that statement, she admitted having an affair with Plaintiff but claimed it only lasted two months. Shirley Statement pp. 162-164 (Ex. 6 to Irmo PD Motion).

Capt. Nates next interviewed Plaintiff. In that interview, Plaintiff admitted he had a sexual affair with Susan Shirley but that all encounters occurred at his residence and on his own time. Pl. Interview pp. 3, 17 (Ex. 8 to Irmo PD Motion); Pl. Dep. 13. He told Capt. Nates that he knew Susan Shirley was married but he thought she was separated. Pl. Interview p. 6. Plaintiff claimed he ended the sexual part of the relationship but that a friendship continued and Susan Shirley continued to come to his house. Pl. Interview p. 7. He admitted that, on one occasion, he drove out of town in his patrol vehicle to follow Susan Shirley home because she thought she was being stalked by someone named Ron. Pl. Interview p. 11; Pl. Dep. 25, 47. Capt. Nates told Plaintiff that it was Chief Buck's position that as long as nothing was done while he was on duty, he did not have anything to worry about. Nates Dep. 36-37.

During the investigation, Capt. Nates learned that Shirley had a private investigator, Byrd Investigations, look into the affair, and the private investigator's records were given to Capt. Nates. Shirley and the investigator that Shirley hired requested that the Police Department provide additional time for the investigation.[3] Internal Affair Investigation Log p. 3. Capt. Nates requested and received an extension from Chief Buck on or about July 1, 2013. Internal Affair Investigation Log p. 3; Nates Dep. 49-50.

The private investigator's records showed that Susan Shirley was at Plaintiff's home on June

---

[3] An investigation should generally be completed within thirty (30) days. Nates Dep. 48.

18, 22 and July 2, 8, 10, 12, and 16. On two occasions (July 12 and 16), she was observed arriving early in the morning and parking behind Plaintiff's house, staying twenty-five to thirty minutes before departing. Byrd Investigation Records (Ex. 10 to Irmo PD Motion). Those records also showed Susan Shirley and Plaintiff went to the movies together on June 18. Byrd Investigation Records. During the investigation, on June 27, Capt. Nates specifically asked Plaintiff if he had any contact with Susan Shirley. Plaintiff responded only by email to say hello and ask how things were going. Investigation Notes Bates 140 (Ex. 4 to Irmo PD Motion); Pl. Dep. 60-61.

Capt. Nates testified that Shirley made it clear on several occasions that he was adamant on having Plaintiff removed from employment. Nates Dep. 68. On August 8, 2013, Defendant Shirley provided Nates a copy of his statement as well as the anonymous letter he had received months prior. Internal Affair Investigation Log p. 3; Shirley Statement (Ex. 10 to Pl. Resp. (Document # 66-10); Anonymous Letter. Shirley's statement was signed and dated July 1, 2013, but it was not on the Defendant Irmo Complaint form or otherwise notarized as required by policy. Shirley Statement; Buck Dep. 16; Nates Dep. 56.

The anonymous letter, while identified to have been enclosed in a Town of Irmo envelope, was neither on Police Department letterhead nor Town of Irmo letterhead. Anonymous Letter; Buck Dep. 33-34. The anonymous letter was also neither dated nor signed, and it was never authenticated nor determined who prepared and mailed the same. Anonymous Letter; Buck Dep. 33-35; Nates Dep. 57-59). As stated above, Defendant Shirley testified that he received the letter in or around April 2013, and that he confronted Susan with it at that time. Shirley Dep. 14. Susan specifically identified the anonymous letter in her written statement but provided sworn testimony that Defendant Shirley confronted her with the letter in or around January 2013. Susan Statement. Defendant

Shirley admitted to Nates that at some point he drafted and/or manufactured a second letter purportedly from Defendant Irmo in order to confront Susan to see her reaction. Internal Affair Investigation Log p. 4; Nates Dep. 62-63; Susan Statement p. 2) This second letter was never produced. Nates Dep. 63.

On July 17, 2013, Capt. Nates learned that Plaintiff had, while on duty and in uniform, gone outside Town limits to see Susan Shirley. Susan Shirley was at the Ale House. Some off-duty Irmo officers were also there and reported that Plaintiff came in and spoke to them briefly but then left. They also reported that Susan Shirley was very intoxicated and interacted with some of the officers. Internal Affair Investigation Log p. 4. During a second interview with Capt. Nates on August 21, 2013, he explained that Susan Shirley had earlier informed him that she was going to the Ale House and would be there until 8:30 at which time she would text him. Plaintiff did not receive a text at 8:30, so he decided to go check on her. Plaintiff stated that he was there for about ten minutes and did not speak to Susan Shirley because she was intoxicated. Town Council Transcript pp. 21-22 (Ex. 8 to Irmo PD Motion); Investigation Notes Bates 141. Plaintiff admitted, in hindsight, it was a bad idea to go to the Ale House. Pl. Dep. 49-51.

Capt. Nates closed the investigation and reported his findings to Chief Buck on August 23, 2013. Internal Affairs Memorandum (Ex. 12 to Pl. Resp. (Document # 70-12). In the report, he recommended that both Plaintiff and Det. Hare be terminated for different violations. Id. Specifically, with respect to Plaintiff, Capt. Nates reported as follows:

> **Misconduct Based on Complaint: Patrolman Keith Saxton**
>
> Patrolman Saxton was involved in an affair with Mrs. Susan Shirley, that they met while on duty, and that he called her extensively on the phone while on duty
> .

> **Sustained**. Patrolman Saxton acknowledged the affair to you on May 23, 2013, when you [Chief Buck] called him and again when I interviewed him on June 3, 2013. Patrolman Saxton denied ever going in the Shirley home or on their property. He did state that he did drive down their street once when she felt that she was being followed. This was confirmed in a phone interview with Mike Outen who lives at 204 Destin Dr. After being given the order to have no contact with either Dr. Shirley or Mrs. Shirley, Patrolman Saxton immediately disobeyed this order. I made copies of text messages between Investigator Hare and Mrs. Shirley that were exchanged on Thursday, May 24, 2013. Mrs. Shirley informs Investigator Hare that Patrolman Saxton told her that her husband called you about the affair and told Investigator Hare what the allegations were against Patrolman Saxton.
>
> On July 17, 2013, Sergeant Dale said he overheard Null and Wells talking about their events at Carolina Ale House the prior Monday or Tuesday night which turned out to be Wednesday, July 10, 2013. Sergeant Dale stated that he heard them say that Sergeant Perry and SPO Null were there eating on their night off and were approached by Mrs. Shirley. Sergeant Dale said he heard them say that Mrs. Shirley kept drinking out of Sergeant Perry's beer glass to the point that he asked her to quit and offered to buy her one so she would stop drinking from his. They indicated that Patrolman Saxton showed up around 11:00 but did not stay long. This was confirmed by statements provided to me by SPO Null and Sergeant Perry along with video surveillance obtained by Carolina Ale House.
>
> **Recommendation–Termination**
>
> **Policy violation 1-05, III, C, Obedience to Orders, which states employees are required to obey any lawful order of a supervisor, including any order relayed from a supervisor by an employee of the same or lesser rank.**
>
> **Sustained.** Patrolman Saxton provided a written statement indicating that he went to the Carolina Ale House to check on Mrs. Shirley because she was supposed to leave around 2030 and he had not hear from her.

Internal Affairs Memorandum pp. 1-2.

After reviewing the memorandum, Chief Buck made the decision to terminate Plaintiff's employment for disobeying a direct order not to contact Susan. Buck Dep. 89-90. He testified that he alone made the decision, although he might have discussed it with the Town Administrator, Bob Brown, prior to discussing it with Plaintiff. Buck Dep. 94-95. On September 3, 2013, Plaintiff was

-8-

asked to attend a meeting with Chief Buck. Buck Dep. 92-96. At that meeting, Plaintiff was instructed that his employment was ending, and he could choose to resign or be terminated. Buck Dep. 92-96; Plaintiff Dep.51-52. Subsequently, a Personnel Action Form was produced indicating that Plaintiff had resigned. Termination Document (Ex. 14 to Irmo PD Motion). Plaintiff denies having signed the form. Pl. Dep. 51-52, 96. However, during a hearing he requested before Town Council, Plaintiff stated he resigned with the intent to talk to Town Administrator Bob Brown about the situation. Town Council Transcript p. 44 (Ex. 11 to Irmo PD Motion). In his unemployment benefit claim form, Plaintiff stated he quit. ESC (Ex. 16 to Irmo PD Motion). In a hearing held regarding unemployment benefits, Plaintiff testified that he "resigned contingent upon talking with the Town Administrator." ESC Hearing Transcript 20 (Ex. 17 to Irmo PD Motion). In his statement to the EEOC, Plaintiff claims he demanded a right to a grievance and said nothing about having resigned. Plaintiff EEOC Statement (Ex. 18 to Irmo PD Motion). Nevertheless, for purposes of this motion, Defendants treat Plaintiff's separation from employment as a termination.

As stated above, Plaintiff was provided an opportunity to present his case to Town Council. Pl. Dep. 54, 76. Shortly thereafter, Plaintiff was contacted by Councilman Barry Walker directly and urged to resign and move on; Walker also indicated to Plaintiff "If [it] had not been a white woman, this would not have been an issue." Pl. Dep. 74. Plaintiff was informed by Walker that Town Council was upholding the decision; however, this was never put in writing to Plaintiff. Pl. Dep. 76-77.

### III. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir.

1993); Local Rules 7.04, 7.05, D.S.C.

## IV.  DISCUSSION

### A.  Irmo PD and Chief Buck's Motion for Summary Judgment

#### 1.  Race Discrimination

Plaintiff argues that the Irmo PD discriminated against him because of his race in violation of Title VII.  Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof.  First, he may establish through direct or circumstantial proof that a protected characteristic such as race was a motivating factor in the employer's adverse decision. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir.2005); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir.2004) (en banc). This is referred to as mixed-motive.  In mixed-motive cases, the plaintiff need not show race was the sole motivating factor, but only that it was a motivating factor. Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). Direct evidence is defined as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir.2006) (internal quotations omitted). Direct evidence is said to prove a fact "without any inference or presumptions." O'Connor v. Consol. Coin Caterers Corp., 56 F.3d 542, 548 (4th Cir.1995).  Circumstantial evidence must be of sufficient probative force to raise a genuine dispute of material fact.  Evans v. Technologies

Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996).

Plaintiff argues that he can establish his claim of race discrimination by showing a "convincing 'mosaic' of circumstantial evidence such that a reasonable jury could infer discriminatory intent." Pl. Response p. 12. Under this approach,

> [n]o single piece of evidence might amount to a smoking gun…but the convincing mosaic approach allows a plaintiff to establish Retaliation 'by assembling a number of pieces of evidence non meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction….

Hobgood v. v. Ill. Gaming Bd., 731 F.3d 635, 647 (7th Cir. 2013); see also Cason v. S.C. State Ports Auth., 2:11–CV–2241–RMG, 2014 WL 588065, *4 (D.S.C. Feb. 14, 2014) (citing Hobgood). This mosaic of circumstantial evidence theory has not been adopted by the Fourth Circuit. Giraldo v. City of Columbia, No. 3:12-cv-3357-JFA, 2014 WL 4700645 (D.S.C. Sept. 18, 2014). In Giraldo, the court stated,

> [A]fter research, this Court can only find one case within the Fourth Circuit that cited and applied the mosaic theory, and it is the District of South Carolina case cited by Plaintiff. Nevertheless, this Court is not persuaded by the mosaic theory, or that application of the mosaic theory is binding. Further, Plaintiff has cited to no precedent establishing that the Fourth Circuit Court of Appeals has adopted the mosaic theory.

Id. at *2; see also Harrison v. S.C. Dep't of Mental Health, No. 3:12-cv-1754-JFA, 2014 WL 4700642, * 3 (D.S.C. Sept. 18, 2014). The law in this circuit provides that when evaluating whether the plaintiff has proffered sufficient circumstantial evidence to sustain her claims in the face of a summary judgment motion, the court should consider whether, as a whole, the plaintiff has "presented probative circumstantial evidence to show that [the employer] acted with discriminatory animus." Warch, 435 F.3d at 521; see also Hill, 354 F.3d at 286; Evans, 80 F.3d at 959. The court

should consider the evidence as a whole rather than in isolation. See, e.g., Cook v. CSX Trans. Corp., 988 F.2d 507, 512 (4th Cir.1993) ("To focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn.").[4]

Plaintiff argues that he has presented facts sufficient under a mixed-motive method of proof to show that race was a motivating factor in his termination[5]. He argues that

> (1) that he was one of only a few black officers employed by Defendant Irmo; (2) that Defendant Irmo had received numerous threats from Defendant Shirley – who acknowledged to others that he did not like black people – to have Plaintiff removed; (3) that Defendant Irmo had no evidence to support sustaining Defendant Shirley's allegations against Plaintiff yet did so anyway; (4) that Defendant Irmo elected to terminate Plaintiff based upon nothing more than a contested assertion by Defendant Buck that has no supporting evidence; and (5) that other male officers – including Hare who was disciplined at the same time of Plaintiff – committed more egregious acts yet did not suffer a like discipline.

Pl. Resp. p. 13 (Document # 70). Importantly, Plaintiff fails to point to any evidence in support of his assertions that he was one of only a few black officers employed by the Police Department or that Defendant Shirley acknowledged to others that he did not like black people. Even if he had, these assertions do not go towards any motivation on the part of the decision maker regarding action taken against Plaintiff. The remaining arguments raised by Plaintiff are also insufficient to show that race was a motivating factor in Plaintiff's termination. These arguments, regarding whether other, white employees were disciplined in the same manner as Plaintiff and whether the reason given for Plaintiff's termination was true, are more appropriately considered under a burden-shifting method

---

[4]The court notes that in both Hobgood and Cason the "convincing mosaic of circumstantial evidence" approach is used with respect to the but-for analysis necessary in retaliation cases. Hobgood, 731 F.3d at 643-44; Cason, 2014 WL 588065, *4.

[5]The court takes no position on whether Plaintiff resigned or was terminated, but simply addresses the race discrimination claim as it has been addressed by the parties.

of proof, as discussed below. The evidence relied upon by Plaintiff fails to amount to circumstantial evidence sufficient to create an inference under the mixed-motive method of proof that Plaintiff was terminated because of his race.

As mentioned above, when direct evidence is lacking, a plaintiff may proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination. Id. To establish a prima facie case of either race or sex discrimination, the plaintiff must present facts showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) similarly-situated employees outside the protected class received more favorable treatment. White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir.2004). The fourth element can also be met by showing other circumstances giving rise to a reasonable inference of unlawful discrimination. Miles v. Dell, Inc., 429 F.3d 480, 486–87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Postal

Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

Defendants do not dispute that Plaintiff is a member of a protected class, that he suffered an adverse employment action or that he was performing his job duties at a level that met the Police Department's legitimate expectations at the time of the adverse employment action. Defendants argue that Plaintiff fails to point to similarly situated employees outside his protected class that were treated more favorably. Although courts do not always require comparator evidence, a plaintiff who bases his allegations entirely upon a comparison to other employees, as here, "must demonstrate that the comparator was 'similarly situated' in all relevant respects." Sawyers v. United Parcel Serv., 946 F.Supp.2d 432, 442 (D. Md. 2013) aff'd 13-1777, 2014 WL 2809027 (4th Cir. June 23, 2014). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Haywood v. Locke, 387 Fed.Appx. 355, 359 (4th Cir. 2010) (quoting Mitchell v. Toledo Hospital, 964 F.2d 577. 583 (6th Cir. 1992)); see also Humphries v. CBOCS W. Inc., 474 F.3d 387, 405 (7th Cir. 2007) ("[T]he purpose of the similarly situated requirement is to eliminate confounding

variables, such as differing roles, performance histories, or decision making personnel....") aff'd. 553 U.S. 442 (2008).

Plaintiff points to white officers he claims were treated differently. Plaintiff first points to Hare, the white officer Susan asked to talk with Shirley after Shirley received the anonymous letter to assure Shirley that he did not need to worry about Plaintiff. Susan also texted Det. Hare after Shirley called Chief Buck about the alleged affair. Capt. Nates investigated Det. Hare's conduct at the same time as Plaintiff's, cited several policy violations and recommended that he be terminated. Internal Affairs Memorandum. Capt. Nates concluded,

> Investigator Hare's action and involvement with the Shirley's [sic] does [sic] not demonstrate good judgment or knowledge of our Departmental Policies and Procedures that are required in his position. Investigator Hare's documented policy violations clearly show that his actions alone hindered an investigation, damaged the public trust and credibility of the Irmo Police Department.
>
> The text messages between Investigator Hare and Mrs. Shirley show Investigator Hare's lack of integrity. Instead of telling Mrs. Shirley that the allegations made by her husband needed to be investigated, he told her on Friday, May 24, 2013, at 17:36 that "if he can't prove it, I wouldn't worry about it." Mrs. Shirley then told Investigator Hare at 17:42 that Patrolman Saxton is being accused of patrolling out of town limits and behavior not becoming officer. Investigator Hare responded by saying, "those aren't good accusations."
>
> Investigator Hare should have taken the position, even though he and Mrs. Shirley are only casual acquaintances, that anyone accused of misconduct should be investigated and held accountable for their actions if they are in fact found guilty of misconduct. Instead, the way Investigator Hare conducted himself with Dr. Shirley would lead anyone to believe, in my opinion that he was associated with a coverup of Patrolman Saxton's misconduct.

Internal Affairs Memorandum. Despite Capt. Nate's recommendation that Hare be terminated, he was permitted to keep his job, but was demoted, transferred, and possibly suspended. Buck Dep. 84. Chief Buck testified that Hare was not terminated because his offenses were different from the ones

Plaintiff had committed. Buck Dep. 84. While Plaintiff disobeyed an order to refrain from contacting Susan, a witness in an Internal Affairs investigation specifically involving Plaintiff, Hare failed to document the information he received from Shirley regarding the anonymous letter Shirley received, which included accusations against a member of the Police Department, and improperly tried to assure Shirley that he had nothing to worry about. Shirley's conduct occurred before an investigation began. "The similarity between comparators...must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir.2008). Plaintiff has failed to present sufficient evidence to create an issue of fact with respect to Hare.

Plaintiff also points to Richie Foster, another white male officer, who Plaintiff asserts was disciplined, but not terminated, for failing to follow a direct order to have a car towed, which Plaintiff asserts he heard through the rumor mill, although he testified that Foster confirmed it himself. Pl. Dep. 73-74. Capt. Nates avers that Foster failed to contact the next towing service on a list of providers, but instead allowed the owner of the vehicle to arrange towing. Nates Aff. ¶ 9 (Ex. 7 to Irmo PD Motion). Capt. Nates avers that the matter was not elevated to the Chief's level and was much less serious than Plaintiff's contact with a witness to an Internal Affairs investigation. Id. Plaintiff admits that Nates disciplined Foster rather than Chief Buck. Pl. Dep. 73-74. While the violation here was the same, disobeying an order, the conduct itself was less serious. Further, Plaintiff's discipline and Foster's discipline were handled by different supervisors, which negates a finding that Plaintiff and Foster were similarly situated.

Plaintiff also argues that Chief Buck committed three violations that led to disciplinary action against him, yet he was only provided a brief suspension at worst. Buck Dep.99-101. Two disciplinary actions were administered while he served as Chief of Police. Buck Dep. 101. Although

Plaintiff does not directly address Chief Buck's conduct, the cited testimony reveals that, during his 24-year career, Chief Buck was suspended for being involved in a pursuit, failing to lock a locker in the property room, and taking a day off without notifying the Town Administrator. Buck Dep. 100. Two of the three suspensions occurred while he was the Police Chief. Again, given Chief Buck's conduct and his rank at the time of his conduct, Plaintiff fails to show that he was similarly situated to him.

Plaintiff also mentions Brian Bennett and Riley Null. Riley Null was terminated, but only after several offenses. Nates Dep. 108-09. Plaintiff argues that Null was treated more favorably because he was given several chances, but he does not discuss Null's conduct prior to termination. Capt. Nates received a complaint regarding Brian Bennett being parked outside of town limits, but he could not recall the circumstances. Nates Dep. 107-08. Bennett was not terminated. Id. The record is insufficient with respect to these two officers to create an issue of fact as to whether they were similarly situated to Plaintiff.[6] As such, Plaintiff fails to establish a prima facie case of race discrimination.

Because Plaintiff failed to present sufficient evidence to create a prima facie showing of intentional race discrimination, the inquiry ends, and summary judgment is appropriate on this

---

[6]Plaintiff complains in his Response that Defendants objected to his discovery requests relating to other employees who had received disciplinary action or who had been relieved of duty and for copies of internal affairs investigation files. See Pl. Resp. p. 16 (Document # 70); Pl. Discovery Requests (Ex. 18 to Pl. Resp.). Defendant asserts that Plaintiff did not question their objections or follow up on them or file a motion to compel. Irmo PD Reply p. 3-4 (Document # 72). Defendants further note that they questioned Plaintiff in his deposition about who he thought committed comparable offenses, and addressed the disciplinary record of every officer named by Plaintiff. See Pl. Dep. 69-73; Nates Aff. and attachments (Ex. 7 to Irmo PD Motion).

claim.[7]

### B. State Law Claims

If the district judge accepts this report and recommendation, the original federal jurisdiction claim will be dismissed and the only remaining claim will be Plaintiff's state law claims. Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). See also, e.g., United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Revene v. Charles County Comm'rs, 882 F.2d 870, 875 (4th Cir.1989). Therefore, the undersigned recommends that the district judge decline to retain jurisdiction over Plaintiff's state law claims and remand this action to the Court of Common Pleas, Lexington County.[8]

---

[7]Additionally, Plaintiff fails to present sufficient evidence that the decision given for his termination was pretext for a discriminatory reason. The fact that Chief Buck hired Plaintiff less than a year prior to his termination creates an inference non-discrimination. See, e.g. Proud v. Stone, 945 F.2d 796 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."). Further,"it is not our province to decide whether the reason [for termination] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir.2000) (quoting DeJarnette v. Cornin Inc., 133 F.3d 293, 299 (4th Cir.1998).

[8]Plaintiff requests that, if the court dismisses the race discrimination claim, the state tort claims be remanded.

## V.  CONCLUSION

For the reasons discussed above, it is recommended that Defendants Town of Irmo Police Department and Brian Buck's Motion for Summary Judgment (Document # 54) be granted as to Plaintiff's Title VII cause of action for race discrimination. It is further recommended that the court decline to exercise jurisdiction over Plaintiff's remaining state law claims, including those claims on which Defendant Shirley has moved for summary judgment (Document # 50), and that this action be remanded to the Court of Common Pleas, Lexington County, for further adjudication.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 12, 2017
Florence, South Carolina